UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KENNETH A. ROGERS,

Petitioner,

v.

GARRY SWARTHOUT,

Respondent.

Case No.  14-cv-03087-EMC

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

## I.    INTRODUCTION

Kenneth A. Rogers filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for conspiracy to commit murder and attempted murder with premeditation.  Respondent has filed an answer to the petition and Mr. Rogers has filed a traverse.  For the reasons discussed below, the Court denies the petition.

## II.    BACKGROUND

The California Court of Appeal described the evidence:

> Appellant was the chairperson of the Westport County Water Board and the assistant chief of the Westport Volunteer Fire Department. He was active in the local Republican Party and believed he had a future in Sacramento. Alan Simon, the victim in this case, moved to Westport in 2002.

> Appellant was not universally popular in local politics. In 2004, a petition circulated to recall him from the water board. Simon signed the petition and became the only candidate to run against appellant. Appellant visited Simon at his house and asked him to remove his name from the recall petition, but Simon refused. In an election held August 31, 2004, appellant was recalled from office on a vote of 29 to 19, and Simon replaced him.

> In December 2004, appellant called Simon and said that if he did not put 50,000 gallons of water in the water storage tank by the next morning, appellant "was going to hang" him. Knowing that

appellant was angry about losing the recall election, Simon construed this as a serious threat on his life and reported it to law enforcement.

On January 19, 2005, the water board, led by Simon, voted to replace the chief of the volunteer fire department and appellant, the assistant chief. Appellant said this was a "terrible day for Westport" and filed a lawsuit challenging his termination.

In March 2005, Richard Peacock was released from prison. Appellant knew Peacock and gave him a job at his auto detailing business in Sacramento. Peacock told his parole officer that he "loved" appellant because of their friendship and "would do anything for him."

By May of 2005, Simon had decided to move from Westport and put his home up for sale. Also in May 2005, appellant told a woman who was notarizing loan documents for him that he felt incensed and persecuted over his removal from the water board and fire department.

On June 17, 2005, Richard Peacock travelled to Westport in a white convertible Miata. He was stopped by a police officer in the town of Williams for driving with expired registration and said that he was traveling to Mendocino County with his parole officer's permission. In fact, he did not have his parole officer's permission.

At about 10:30 that night, Richard Peacock knocked on the front door of Alan Simon's house in Westport, aggressively demanding to speak to "Kathy." Simon, who was alone inside, told the man he had the wrong house and called 911. While still on the phone with the dispatcher, Simon opened his door and saw a man leaning against a white sports car with front end damage. Peacock walked back toward Simon, saying, "Hey, man, I don't want any trouble," and then pulled out a gun and fired it at Simon, grazing his head. Simon stepped back inside, closed his front door, and dropped to the floor inside his house. Peacock fired several more shots through the door and injured Simon's right wrist. Police who investigated the scene eventually found eight expended .22 caliber shell casings on Simon's front lawn and nine bullet holes in his front door.

Law enforcement officers spotted Peacock driving the white Miata near Westport the following day. When they attempted to stop him, he accelerated and threw a white plastic bag out the window. Peacock eventually stopped the car and was arrested; the bag was recovered and contained a Ruger .22 caliber semiautomatic handgun containing only one of ten rounds. Ballistics tests revealed that the Ruger was the gun used in the Simon shooting.

The gun was previously owned by Velma Bowen, who had allowed appellant and his family to stay in her home in 1999. During the visit, appellant had stored some guns that he owned under Bowen's bed, near a box where she stored her .22 Ruger. After appellant and his family moved out, Bowen discovered the Ruger was missing. She asked appellant whether he had taken her gun, but he said no, he had his own Ruger. According to appellant's wife, however, she and

United States District Court
For the Northern District of California

appellant later found Bowen's gun in a toolbox and assumed it had been taken inadvertently during their move out of Bowen's home.

Appellant was interviewed about the Simon shooting by Mendocino County Sheriff's Department Detective Alvarado. Appellant acknowledged that he had issues with Simon (describing him as "an asshole," "rude," and "a jerk") but denied having anything to do with the shooting. He admitted telling Simon he wanted to "hang" him politically. Appellant told Alvarado that Richard Peacock and his brother Michael Peacock were convicts, that he had known Richard Peacock for 12 to 15 years, and that he had given Richard Peacock a job in his auto body business because he liked to help people. Appellant said he had also employed Michael Peacock as a groundskeeper of some property he owned near the Jack of Hearts Creek, where he grew marijuana. Appellant was concerned about publicity regarding the marijuana because it was "not really the best thing for a Republican representative to have."

Appellant acknowledged that Richard Peacock had come to the Jack of Hearts property about a week earlier in a white convertible. He told Detective Alvarado that he "hoped to God" Richard Peacock was not involved in the Simon shooting, and commented, "I think Al [Simon] would set up shit like this." When Alvarado said that seemed unlikely given Simon's injuries, appellant suggested that the shooter could have been the husband of one of the women Simon had been "sleeping around with." Appellant complained about the lack of respect shown to him by the "new blood" in Westport and about Simon's public ridicule of him. Appellant continued to deny his involvement in the shooting in a subsequent interview.

On June 26, 2005, Richard Peacock called appellant from the Mendocino County jail and complained about the charges against him. Appellant told him, "[T]hey're trying to pull me into this whole thing, too." Appellant promised to "be there" for Peacock and to "take care of every bit of business on the outside that I have to ... until you're out and free and released from this garbage." Peacock told appellant he was "sorry that all this came to your doorstep."

On June 28, 2005, the authorities searched appellant's Jack of Hearts property and seized 120 to 130 marijuana plants and processed marijuana. Also seized was a digital camera which contained a photo of Alan Simon's home, taken from the inside of a vehicle sometime after March 11, 2005.

Appellant was arrested and on June 29, 2005, made a telephone call from jail to his wife in which they spoke about the evidence against appellant being a "convict story." Appellant called his auto detailing business on the same day and told the person who answered to "make sure everything's all cleaned up." He complained that "Michael and Richard are pulling some bullshit, I don't know what ... my bail is like half a million dollars."

Meanwhile, Richard Peacock received a letter while in jail that read, "Dear Richard. [¶] Hope all is going okay for you. I heard about Michael['[s B.S. and can't believe he could be related to you. Anyway, I will get the "Red Dog" to your kid with some school

3

clothes, money, and will keep an eye out for her. Hope to see you soon, but it's tough. I'm sending ... $40 for your books, more to come. [¶] Your friend, Kate. [¶] P.S. Who's this Keith guy calling for Michael? I'm not returning his calls. I think he has $ for?" The letter had a Yuba City postmark but no address; Richard Peacock did not know any "Kate" from Yuba City, and thought appellant's wife had sent the letter.

Appellant was called as a witness at Richard Peacock's preliminary hearing on August 4, 2005, and winked at Peacock as he left the stand. Later in the day, appellant's then-attorney Donald Masuda gave Peacock's attorney a message to the effect that appellant wanted Peacock to know that appellant's wife would be looking after or taking care of Peacock's daughter. When this message was relayed to Peacock, he became extremely upset and angry and said that the message was a threat to harm Peacock's daughter. Peacock explained that the "Red Dog" mentioned in the letter from "Kate" was a gun that had a red handle or an emblem of a red dog on the handle.[2]

> Footnote 2:  Richard Peacock did not testify, but the prosecutor offered his statements about the threat and the "Red Dog" letter under the spontaneous statement exception to the hearsay rule, based on his demeanor upon receiving the message. (See Evid. Code, § 1240.)

In addition to the evidence described above, the prosecution called Michael Peacock as a witness at appellant's trial. He testified that he had a lengthy criminal record and had spent time in prison. In 2003, appellant and Michael Peacock had several conversations about a Black man in Westport, and appellant was "wishing somebody [would] hurt him, beat him up...."[3] Michael Peacock thought appellant had offered him money and/or marijuana to beat the man up. He helped appellant grow marijuana on his property and saw guns on that property, including one that looked like the gun used in the attack against Alan Simon.

> Footnote 3:  Keith Grier, a Westport resident who attended meetings of the water board, was asked to be a candidate against appellant in the recall election, but declined. Grier is African American.

According to Michael Peacock, he and his brother Richard had a conversation in Sacramento either the day of or the day before the Simon shooting. Richard told Michael he had plans to visit Westport and that appellant had asked him to "severely hurt" the guy who had got appellant "kicked off the water board." Michael had told police that Richard said he had been offered three to four pounds of marijuana by appellant to carry out the attack. Richard was looking for a "piece" and asked Michael where he could get one, though he did not say he was going to use a gun on Alan Simon.[4]

> Footnote 4: The hearsay statements made by Richard Peacock to Michael Peacock were admitted as declarations against interest and statements in furtherance of a conspiracy. (Evid. Code, §§ 1230, 1223.)

United States District Court
For the Northern District of California

> To rebut the evidence that appellant had threatened Richard Peacock's daughter with a gun known as the "Red Dog," appellant's wife, Christine Rogers, testified that she had helped Richard Peacock's wife and his daughter financially, and that appellant had promised Richard he would give his daughter a large stuffed animal—Clifford, the Big Red Dog—that he had won at the Marine World theme park. Alva Haught, who knew appellant and Richard Peacock, testified that in early 2005, he had seen the stuffed dog in appellant's auto body shop and asked if he could have it to give to his daughter.
>
> Eric Beren, who knew both appellant and Richard Peacock, testified that Peacock was scary, violent and "institutionalized." Peacock did not have a lot of friends, and Beren believed he was so loyal to the friends he did have that he would take violent action against anyone who gave them problems. Beren also claimed that he and his wife had been interested in buying property in Westport and that appellant would sometimes show them pictures of houses for sale in that area on his digital camera.
>
> The police officers who searched appellant's home and his property on Jack of Hearts Creek did not find a gun with a red handle or a picture of a red dog on the grip.

*People v. Rogers*, No. A128650, 2012 WL 2053568, at *1-4 (Cal. Ct. App. June 5, 2012).

Mr. Rogers was convicted of one count of conspiracy to commit murder and one count of attempted murder with premeditation.  The superior court sentenced him to twenty-five years to life in state prison.  He appealed.  The California Court of Appeal affirmed the judgment of conviction and denied Mr. Rogers' petition for writ of habeas corpus on June 5, 2012.  The California Supreme Court denied Mr. Rogers' petitions for review on September 12, 2012.  Mr. Rogers then filed several additional unsuccessful collateral challenges in the state courts.

On July 8, 2014, Mr. Rogers filed his federal petition for writ of habeas corpus.  He presented these claims for relief:  (1) he was denied counsel at a critical stage of the proceedings when his retained counsel was allowed to withdraw in a hearing at which Mr. Rogers was not represented by counsel; (2) he received ineffective assistance of trial counsel when trial counsel failed to make a Confrontation Clause objection to Michael Peacock's testimony about statements made by Richard Peacock; and (3) appellate counsel was ineffective in not arguing (a) that trial counsel was ineffective in failing to make the Confrontation Clause objection and (b) that structural error occurred.  Respondent filed an answer to the petition and Mr. Rogers filed a traverse.

### III.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Mendocino County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.   STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

# V.   DISCUSSION

A.    Claim 1: Denial Of Counsel At Hearing On Counsel's Motion To Withdraw

1.    Background

As mentioned at pages 3-4, above, evidence was admitted at trial that Richard Peacock received a message from Mr. Rogers (relayed via Mr. Rogers' attorney at Richard Peacock's preliminary hearing) and the "Red Dog" letter that Richard Peacock interpreted as threats.  Long before trial started, a hearing was held on January 28, 2008, to determine whether this evidence was admissible pursuant to California Evidence Code section 403.  RT 178.

At the section 403 hearing on January 28, 2008, attorney Donald Masuda represented Mr. Rogers.  The first witness at the hearing was Wes Hamilton, a public defender who represented Richard Peacock at the preliminary hearing on August 4-5, 2005.  RT 178.  After Mr. Hamilton provided some preliminary information, Mr. Masuda began his lengthy and vigorous efforts to prevent Mr. Hamilton from testifying as to the effect the message had on Richard Peacock, repeatedly objecting on the grounds of hearsay, attorney/client privilege and that the admission of the statement would violate Mr. Rogers' Confrontation Clause rights.  *See* RT 183-200.  Mr. Masuda's objections were unsuccessful, and Mr. Hamilton eventually testified about Richard Peacock's reaction to the message he received at the preliminary hearing.  RT 185, 200.  That message had been delivered via a relay: Mr. Hamilton testified that "Mr. Masuda gave me a message from Mr. Rogers to give to my client, Mr. Peacock."  RT 182.  The court ruled the evidence of Richard Peacock's reaction to the message was admissible under the spontaneous declaration exception to the hearsay rule.  RT 199.  The prosecutor then attempted to ask Mr. Hamilton about the Red Dog letter, RT 201, and Mr. Masuda objected to the letter as hearsay.

The trial court then expressed concern about Mr. Masuda's ability to continue as defense counsel in the case.  RT 201.  The court explained that the issue of Mr. Masuda's ability to continue as counsel in this case arises "as soon as Mr. Hamilton testifies that he received this information from the attorney for the defendant, it raises questions about counsel" in terms of whether and what he knew about the potential threat to the witness.  RT 201.  The court noted that a stipulation might work, but otherwise "I think this would be material evidence.  I think if it

comes in, if it's what it's represented to be, it seems like it's important evidence in the case in the question of guilt or innocence. It would seem to me that at minimum, Mr. Masuda may have to take the stand just simply to deny that he had any knowledge of what was going on and had no participation other than he thought, innocently, he was conveying information about Mr. Peacock's daughter. [¶] But that still raises the issue of his credibility and I'm concerned about that." RT 202. The court was concerned that the jury would wonder whether counsel was an innocent messenger or knew he was assisting in the making of a threat. RT 203. The prosecutor and the court both made the point that they were not accusing counsel of knowingly aiding in the making of a threat, and the court's concern was the possibility that the jurors might doubt Mr. Masuda's credibility if they heard he was the messenger who delivered the threat. RT 203-04. The court explained that, now that it had "ruled that Mr. Hamilton is going to testify in terms of this statement that was made. And now I know that [Mr. Masuda is] involved in that. So, I think this is the proper time to raise the question" about Mr. Masuda's ability to continue representing Mr. Rogers. RT 204, 205 (court notes that "we at least had to get to the point that the court's satisfied that the statement is coming in. If it didn't come in, then the whole thing is moot").

Mr. Masuda then stated: "I can't even continue to represent Mr. Rogers even in this hearing because, like you say and indicate, I may be a witness in this hearing as to the admissibility of some of these other statements." RT 204. He further stated: "I'm not going to be a witness and litigate in the same proceeding. . . . I'm not going to be a witness, argue my credibility to 12 jurors and then argue on behalf of Mr. Rogers that they should believe me." RT 206. The court agreed that Mr. Masuda could not testify and represent Mr. Rogers at the same time and observed that, even if Mr. Masuda did not testify, his credibility might come in to question if the jury learned that he had delivered the message. RT 206-07. A short recess was taken so that Mr. Masuda could confer with his client and the prosecutor. RT 207. The court stated: "If your client's not willing to waive the potential conflict, you need to decide whether you're willing to enter into a stipulation. And I guess you need to talk to your client about that aspect. And if not, I think I'm in a position I'll have to relieve you." RT 207. After the recess, Mr. Masuda asked to be relieved as counsel, stating that he believed he would have to testify. RT

United States District Court

For the Northern District of California

208. Mr. Masuda asked for someone other than a public defender be appointed to represent Mr. Rogers. RT 208. The court deferred, stating that he did not know Mr. Rogers' financial situation and, if Mr. Rogers could afford counsel, he would be given time to retain counsel. RT 208. The court stated that "I think based on what I've heard, you should be relieved." RT 208; RT 210 ("I am relieving you as counsel . . . based on the conflict."). The court also explained that the court could not appoint counsel if Mr. Rogers had the ability to retain counsel, and told him to apply for the appointment of counsel so a financial determination could be made. RT 209-10. The court set the matter for a status conference in three weeks to give Mr. Rogers time to hire counsel or explain his efforts to hire counsel. RT 211. The court then formally paused the hearing on the Rule 403 motion to determine the admissibility of the Red Dog letter. "This proceeding will be stayed at this point and we will continue the matter once he has new counsel." RT 211. The court set a hearing date for February 22, 2008, and stated, "Mr. Rogers, that's for you to appear with counsel if you have counsel. If you don't have counsel, be prepared to respond to the court's questions in terms of efforts you've made to obtain counsel." RT 211-212. Mr. Rogers agreed and thanked the court when the court noted that if, at the February 22 hearing, "you need more time, the court will certainly consider it." RT 212.

At the January 28, 2008 hearing, Mr. Rogers did not object or otherwise disagree with Mr. Masuda's motion or the court's ruling allowing him to withdraw. *See* RT 204-211. After counsel withdrew, it took many months for Mr. Rogers to obtain a new attorney, apparently due in large part to the fact that he did not qualify for court-appointed counsel because he owned a business but did not have readily available funds to pay an attorney of his choice. *See* RT 253.

In his federal petition for writ of habeas corpus, Mr. Rogers claims that he was denied counsel at the hearing on January 28, 2008, at which Mr. Masuda was permitted to withdraw. Mr. Rogers urges that separate counsel should have been provided to him so that he would have had an opportunity to be heard and resist the efforts of his retained attorney to withdraw from the case without first refunding part or all of the $87,500 retainer Mr. Rogers had paid him for representation through trial. Mr. Masuda's withdrawal allegedly prejudiced Mr. Rogers because, without a refund from the retainer, he was without readily available funds to hire a replacement

9

attorney.

Mr. Rogers' claim that he was denied counsel at the hearing on the motion to withdraw was rejected without discussion by the California Supreme Court. *See* Resp. Ex. W. The claim had been presented in Mr. Rogers' petition for review of the California Court of Appeal's denial of Mr. Rogers' motion to recall the remittitur and reinstate the appeal. Resp. Ex. V at 4, 7-8. [1]

2.     Analysis

The Sixth Amendment guarantees to a person accused of a state or federal crime the effective assistance of counsel at trial. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). In order to satisfy the Sixth Amendment, counsel must be present at all "critical stages" of the prosecution, absent an intelligent waiver by the defendant. *United States v. Wade*, 388 U.S. 218, 226, 237 (1967); *United States v. Hamilton*, 391 F.3d 1066, 1070-71 (9th Cir. 2004). It is not enough that counsel be present at trial; counsel also must be present "'at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.'" *Coleman v. Alabama*, 399 U.S. 1, 7 (1970) (quoting *Wade*, 388 U.S. at 226. The Supreme Court has identified the following as critical stages of the prosecution, and therefore as stages at which the defendant has the right to counsel: an arraignment, *id.* at 7 (citing *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961); a postindictment pretrial lineup, *Wade*, 388 U.S. at 226; and a preliminary hearing, *Coleman*, 399 U.S. at 9-10. Where counsel is absent during a critical stage, the defendant need not show prejudice because the adversarial process itself has become presumptively unreliable. *United States v. Cronic*, 466 U.S. 648, 659 (1984) ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.").

The Supreme Court has not held that a hearing on a defense counsel's motion to withdraw as counsel is a critical stage at which counsel must be present. The Supreme Court also has never

---

[1] On direct appeal, Mr. Rogers had asserted a different claim regarding Mr. Masuda: Mr. Rogers had argued that he was deprived of the right to counsel of his choice because the court allowed Mr. Masuda to withdraw based on a conflict of interest that did not actually exist. The California Court of Appeal discussed and rejected that claim, *see Rogers*, 2012 WL 2053568, at *7-9, and Mr. Rogers does not repeat that claim in his federal habeas petition.

United States District Court
For the Northern District of California

held that, when a defense attorney moves to withdraw based on a perceived conflict, the trial court must provide a separate attorney for the defendant before the trial court may consider defense counsel's motion.

One case that, at first glance, may appear to show the existence of the claimed right but ultimately does not support Mr. Rogers' position is *Holloway v. Arkansas*, 435 U.S. 475 (1978). There, an attorney who had been appointed to represent three codefendants, moved for appointment of separate counsel for each codefendant; he made the motion a few weeks before trial, on the morning set for trial and again during the trial.  The attorney explained in his motions that, because of confidential information received from the codefendants, he was confronted with the risk of representing conflicting interests and therefore could not provide effective assistance for each client. The trial court refused to appoint separate attorneys, and told counsel to let the defendants testify in narrative form as a way to address counsel's alleged inability to cross-examine each of them due to his claimed conflict.  *See id.* at 479-80.  The Supreme Court found the trial court's approach wholly unacceptable.  The Court stated that it did not need to resolve how to evaluate a claim where defense counsel failed to advise the trial court of a conflict because defense counsel in this case did alert the court to a conflict.

> Here trial counsel, by the pretrial motions of August 13 and September 4 and by his accompanying representations, made as an officer of the court, focused explicitly on the probable risk of a conflict of interests. The judge then *failed either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel.*  We hold that the failure, in the face of the representations made by counsel weeks before trial and again before the jury was empaneled, deprived petitioners of the guarantee of "assistance of counsel."

*Id*. at 484 (emphasis added; footnote omitted).

The italicized portion of that block quote from *Holloway* does not stand for the proposition that a trial court must appoint separate counsel for the defendant for purposes of litigating the motion for new counsel.  It is clear from the context that the italicized portion of the block quote from *Holloway* refers to the need to appoint separate counsel to represent the codefendants at trial, rather than a need to appoint separate counsel to represent the codefendants at the hearing on the

**United States District Court**
For the Northern District of California

1   motion for separate counsel.  In *Holloway*, there would have been no need to appoint separate

2   attorneys for the codefendants just for the purpose of the hearing because the attorney's argument

3   was not antagonistic to each codefendant's interest; the one attorney was making the argument that

4   each codefendant had the right to a separate attorney.  Further, the discussion that followed the

5   quoted portion of *Holloway* concerned the conduct of trial and the need to refrain from forcing

6   counsel to pursue diverging and inconsistent interests.  *See id.* at 484-85.   Finally, *Holloway*'s

7   mention of an alternative to appointing separate counsel -- the trial court could appoint separate

8   counsel *or* "take adequate steps to ascertain whether the risk was too remote to warrant separate

9   counsel" -- would be pointless if counsel had to be appointed for the hearing on the motion

10  because that would be the point at which the court would be deciding whether the risk of conflict

11  was too remote to warrant separate counsel.  In other words, counsel did not need to be appointed

12  for the court to determine that it is unnecessary for counsel to be appointed.

13          That *Holloway* does not establish a right to separate counsel at a motion to withdraw or a

14  motion to substitute counsel is confirmed by later Supreme Court decisions describing the case.

15  *See Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (*Holloway* "creates an automatic reversal rule

16  only where defense counsel is forced to represent codefendants over his timely objection, unless

17  the trial court has determined that there is no conflict."); *id.* at 189 (Souter, J., dissenting) (citing

18  *Holloway* for proposition that, "[u]nless the judge finds that the risk of inadequate representation

19  is too remote for further concern, or finds that the defendant has intelligently assumed the risk and

20  waived any potential Sixth or Fourteenth Amendment claim of inadequate counsel, the court must

21  see that the lawyer is replaced"); *Wheat v. United States*, 486 U.S. 153, 159-60 (1988) ("While

22  'permitting a single attorney to represent codefendants . . . is not *per se* violative of constitutional

23  guarantees of effective assistance of counsel" *Holloway*, [435 U.S. at 482], a court confronted with

24  and alerted to possible conflicts of interest must take adequate steps to ascertain whether the

25  conflicts warrant separate counsel").

26          Although the Supreme Court has not established a right to separate counsel at a hearing on

27  a motion to substitute counsel, the Ninth Circuit has recognized that separate counsel may be

28  appropriate sometimes.  "In the context of a motion to substitute counsel, [the Ninth Circuit] has

United States District Court
For the Northern District of California

1    suggested that separate counsel may be warranted, for purposes of the motion, where current

2    counsel fails to assist the defendant in making the motion or takes an adversarial and antagonistic

3    stance regarding the motion." *Stenson v. Lambert*, 504 F.3d 873, 888 (9th Cir. 2007). *Stenson* did

4    not state that the Supreme Court had required appointment of separate counsel for the hearing and

5    instead cited only Ninth Circuit cases for the proposition that separate counsel may be warranted

6    for the hearing on the motion to substitute. *See id.* at 888-89. *Stenson* actually held that the state

7    supreme court's determination that the trial court was not required to appoint independent counsel

8    to represent the defendant at the motion to substitute counsel "was a reasonable application of

9    Supreme Court precedent" because the attorney "did not engage in egregious conduct amounting

10   to an absolute denial of representation." *Id.* at 889.

11        Not only is *Stenson* not "clearly established law" from the Supreme Court for purposes of

12   § 2254(d), *Stenson* is distinguishable in several ways. First, the motion under consideration was

13   of a different sort than that here. Mr. Rogers was not trying to obtain a new attorney. Unlike

14   *Stenson*, the attorney in Mr. Rogers' case wanted to withdraw and Mr. Rogers did not express

15   disagreement with the attorney's request. *See United States v. Dompier*, 361 F. App'x 823, 824

16   n.1 ("Separate counsel is not warranted, for purposes of the substitution motion, unless current

17   counsel takes an adversarial and antagonistic stance regarding the motion.") Second, if Mr.

18   Rogers wanted to force Mr. Masuda to continue to represent him, his argument would have been

19   that there was *no* conflict of interest. He did not make that argument. Third, the *Stenson*

20   defendant had an appointed counsel, whereas Mr. Rogers had retained counsel. Even if *Stenson*

21   supported the proposition that Mr. Rogers could have a separate attorney, Mr. Rogers would have

22   had to hire that attorney as nothing in *Stenson* gives a client who can afford an attorney a right to

23   have a separate counsel appointed on his behalf. In other words, if a separate attorney was

24   necessary, it would have been incumbent on Mr. Rogers to hire him or her because Mr. Rogers did

25   not qualify for appointment of counsel at state expense. Mr. Rogers took no steps to hire a second

26   attorney to resist Mr. Masuda's motion to withdraw as counsel.

27        Mr. Rogers' first claim fails at the threshold because the Supreme Court has never held

28   that a client has a right to have a separate attorney represent him when his defense counsel moves

13

**United States District Court**
For the Northern District of California

1  to withdraw from the case.  There is no "clearly established Federal law, as determined by the

2  Supreme Court of the United States," which is a necessary predicate to relief in any habeas case

3  (such as this one) governed by the AEDPA.  *See* 28 U.S.C. § 2254(d)(1).  Without the existence of

4  clearly established Federal law, the state court's rejection of the claim cannot be said to be

5  contrary to or an unreasonable application of such law.  *See Carey v. Musladin*, 549 U.S. 70, 77

6  (2006); *see, e.g., id.* at 76-77 (given the lack of holdings from the Supreme Court and the wide

7  divergence of the lower courts on the issue of the potentially prejudicial effect of spectators'

8  courtroom conduct, the state court's determination that the petitioner was not inherently

9  prejudiced by spectators wearing buttons depicting the murder victim was not contrary to or an

10  unreasonable application of clearly established Supreme Court law); *Wright v. Van Patten*, 552

11  U.S. 120, 126 (2008) (per curiam) (although Supreme Court had held that prejudice may be

12  presumed when counsel is completely absent from proceedings, no Supreme Court precedent

13  squarely addressed whether counsel's telephonic appearance should be treated as a complete

14  denial of counsel; "because our cases give no clear answer to the question presented, let alone one

15  in [the habeas petitioner's] favor, it cannot be said that the state court unreasonably applied clearly

16  established Federal law"); *Varghese v. Uribe*, 736 F.3d 817, 821 (9th Cir. 2013) (because there is

17  no Supreme Court authority that squarely addresses petitioner's claim – that a criminal

18  defendant's rights to counsel and due process are violated when the state court conditions his

19  access to, and testing of, the prosecution's limited evidence on the disclosure of the test results to

20  the prosecution – the state appellate court had no specific rule to apply, so its decision was not an

21  unreasonable application of clearly established Supreme Court precedent); *Foote v. Del Papa*, 492

22  F.3d 1026, 1030 (9th Cir. 2007) (Nevada Supreme Court's rejection of petitioner's conflict of

23  interest claim was neither contrary to nor an unreasonable application of clearly established

24  federal law; although Supreme Court had held an irreconcilable conflict between a defendant and

25  his trial counsel may entitle him to new counsel, no Supreme Court case had held an irreconcilable

26  conflict between the defendant and his appointed appellate counsel violates the Sixth

27  Amendment).  Mr. Rogers is not entitled to relief on his first claim.

28

**United States District Court**
For the Northern District of California

B.      Claim 2:  Ineffective Assistance of Trial Counsel

      1.      Background

Mr. Rogers claims that his trial counsel provided ineffective assistance when he failed to make a Confrontation Clause objection to Michael Peacock's testimony about statements made by Richard Peacock.[2]

At trial, Michael Peacock testified that he had a conversation with his brother, Richard Peacock, in June 2005 in Sacramento. Michael Peacock testified that (1) Richard Peacock told him that he (Richard) had plans to visit Mr. Rogers regarding "some issues probably pertaining to what took place," RT 1292, 1305; (2) Richard Peacock told Michael that Mr. Rogers had asked Richard "to severely hurt the guy" who had caused Mr. Rogers to get "kicked off the water board," RT 1301; (3) "we had conversation about him going to put hands on Simon and all that kind of stuff," RT 1306; and (4) he (Michael) told the police that his brother (Richard) had told him he (Richard) was not going to kill Simon but was going to hurt him, RT 1307.

The trial court ruled that Richard Peacock's statements as to what Richard Peacock was going to do were admissible under the declaration against penal interest exception to the hearsay rule.  RT 1296-97. The trial court also ruled that the evidence was admissible under California Evidence Code section 352, which requires balancing probative value against prejudice.  *Id.* at 1297.  The trial court also ruled that Michael Peacock could testify about statements made by Richard Peacock as to what Mr. Rogers had told Richard Peacock, as those statements were admissible because they were made in furtherance of the conspiracy.  RT 1299-1300. Counsel did not assert an objection under the Confrontation Clause.

The California courts rejected Mr. Rogers' Confrontation Clause claim without discussion.

Resolution of Mr. Rogers' ineffective-assistance claim is straightforward:  A Confrontation Clause objection would have been denied because the testimony was not barred by the Confrontation Clause.  Counsel did not engage in deficient performance in failing to make the

---

[2] Plaintiff does not claim IAC due to any alleged failure to assert a state law hearsay objection. The hearsay objection was made (RT 1296) and was overruled as declaration against penal interest.

1   meritless objection, and there was no resulting prejudice.

2       2.   Analysis

3           a.   Ineffective Assistance Of Counsel Standards

4       The Sixth Amendment's right to counsel guarantees not only assistance, but effective

5   assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

6   judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

7   functioning of the adversarial process that the trial cannot be relied upon as having produced a just

8   result. *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

9   must establish two things.  First, he must demonstrate that counsel's performance was deficient

10  and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id.*

11  at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance,

12  i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

13  of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability

14  sufficient to undermine confidence in the outcome.  *Id.*

15      A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

16  counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question

17  is not whether counsel's actions were reasonable.  The question is whether there is any reasonable

18  argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S.

19  86, 105 (2011).

20          b.   A Confrontation Clause Objection Would Have Failed

21      The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

22  accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The

23  ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a

24  procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but

25  that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination."

26  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

27      The Confrontation Clause applies to all "testimonial" statements. *See Crawford*, 541 U.S.

28  at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of

**United States District Court**
For the Northern District of California

establishing or proving some fact." *Id.* at 51 (internal quotation marks and brackets omitted); *see id.* at 51 ("[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"); *id.* at 68 ("[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations"). In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court distinguished testimonial and nontestimonial statements to police. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822; *see, e.g., id.* at 826-28 (victim's frantic statements to a 911 operator naming her assailant who had just hurt her were not testimonial); *id.* at 829-30 (victim's statements to officer telling him what had happened were testimonial, as there was no emergency in progress and were made after police officer had separated victim and assailant); *Crawford*, 541 U.S. at 39-40, 68 (statements were testimonial where made by witness at police station to a series of questions posed by an officer who had given *Miranda* warnings to witness and was taping and making notes of the answers).

Before *Crawford* was decided, the Confrontation Clause analysis had been governed by the "indicia of reliability" test set out in *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). Under the *Roberts* test, hearsay statements could be introduced only if the witness was unavailable at trial and the statements had "adequate indicia of reliability," i.e., the statements fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66. *Roberts* was overruled in *Crawford*, although some readers of the *Crawford* opinion believed that *Roberts* was not overruled as to nontestimonial statements. Two years later, the Supreme Court clarified in *Davis v. Washington*, 547 U.S. 813, 821 (2006), that the *Roberts* test had *no* continuing validity. Nontestimonial hearsay, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821. The

Supreme Court made the same point again the following term, when it referred to "*Crawford's* elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements." *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

In an en banc decision, the Ninth Circuit has recognized that the *Roberts* test no longer survives, and that nontestimonial statements are now outside the scope of the protection of the Confrontation Clause. *See United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc). The court explained that it earlier was unresolved whether the *Roberts* test "to determine the admissibility of out-of-court nontestimonial statements survived *Crawford*," but the Supreme Court then clarified in *Bockting*, 549 U.S. 406, "that *Crawford* 'eliminat[es] Confrontation Clause protection against the admission of unreliable out-of-court non-testimonial statements' and that 'the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.'" *Larson*, 495 F.3d at 1099 n.4 (alteration in original); *see also Delgadillo v. Woodford*, 527 F.3d 919, 924 (9th Cir. 2008) ("*Crawford* rejected [the *Roberts*] framework for analyzing Confrontation Clause violations," and nontestimonial statements no longer raise Confrontation Clause concerns).[3]

There is now a bright line rule: the Confrontation Clause does not apply to nontestimonial hearsay. *See Bockting*, 549 U.S. at 420; *Davis*, 547 U.S. at 821; *Crawford*, 541 U.S. at 50-51; *Larson*, 495 F.3d at 1099 n.4; *Delgadillo*, 527 F.3d at 924.

---

[3] Other circuits also have concluded that the Confrontation Clause no longer applies to nontestimonial hearsay statements, although they have not all agreed on whether it was *Crawford*, *Davis* or *Bockting* that sounded the death knell. *See United States v. Castro-Davis*, 612 F.3d 53, 64 n.14 (1st Cir. 2010) ("until *Davis*, *Roberts* remained the controlling precedent for judging whether non-testimonial hearsay violated the Confrontation Clause. After *Davis*, however, non-testimonial hearsay no longer implicates the Confrontation Clause at all"); *United States v. Smalls*, 605 F.3d 765, 774 (10th Cir. 2010) (footnote omitted) (*Davis* "squarely confronted the issue of whether the Confrontation Clause had any application to nontestimonial hearsay statements, or, in other words, whether any portion of *Roberts* remained good law. In *Davis*, the Court placed the question of the admissibility of nontestimonial hearsay statements entirely outside the confines of the Confrontation Clause and rendered *Roberts* academic"); *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (although it had been an open question whether nontestimonial statements continued to be governed by the *Roberts* test after *Crawford*, the Supreme Court's later decisions in *Davis* and *Bockting* answered the question in the negative).

United States District Court
For the Northern District of California

The statements at issue here are not testimonial.  The out-of-court statements made during a private conversation between brothers are just the sort of communications that courts have repeatedly held to be nontestimonial and therefore outside the protection of the Confrontation Clause.  *See, e.g., Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) ("the Confrontation Clause no longer applied to nontestimonial hearsay such as the friend-to-friend confession"); *United States v. DeLeon*, 678 F.3d 317, 321-24 (4th Cir. 2012), *judgment vacated on other grounds*, 133 S. Ct. 2850 (2013) (admission of evidence of stepson's statements describing his defendant-stepfather's disciplinary methods to social worker made several months before the stepson died did not implicate the Confrontation Clause because they were made for purposes of formulating a family treatment plan and were not testimonial); *United States v. Berrios*, 676 F.3d 118, 127-28 (3d Cir. 2012) (admission of evidence of surreptitiously recorded jailhouse conversations between codefendants did not violate the Confrontation Clause because they were not testimonial.  The admission of the nontestimonial hearsay statements from Richard Peacock to Michael Peacock did not implicate, let alone violate, Mr. Rogers' Confrontation Clause rights.[4]

The foregoing is fatal to Mr. Rogers' claim that his trial counsel provided ineffective assistance in not making a Confrontation Clause objection.  Trial counsel did not engage in deficient performance, and no prejudice resulted, when counsel did not make the objection that would have been legally meritless.  *See generally Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance).  Mr. Rogers is not entitled to habeas relief on his claim that counsel provided ineffective assistance in not asserting a Confrontation Clause objection to Michael Peacock's testimony about Richard Peacock's

---

[4] In his traverse, Mr. Rogers argues that the testimony was impermissible under *Williamson v. United States*, 512 U.S. 594 (1994).  *Williamson* does not aid the analysis here for three reasons. First, it was not a decision interpreting the constitution and instead was an interpretation of Federal Rule of Evidence 804(b)(3), which provides the declaration against interest exception to the federal hearsay rule.  The Federal Rules of Evidence do not govern the conduct of trials in California state courts.  Second, *Williamson* expressly declined to decide the Confrontation Clause question:  "In light of this disposition, we need not address Williamson's claim that the statements were also made inadmissible by the Confrontation Clause."  *Williamson*, 512 U.S. at 605.  Third, even if *Williamson* had reached the Confrontation Clause issue, the decision would be of little help because it predated *Crawford* and likely would have relied on the indicia-of-reliability test that later was rejected in the *Crawford* decision.

statements.

C.   Claim 3:  Ineffective Assistance of Appellate Counsel

In his third claim, Mr. Rogers contends that his appellate counsel was ineffective in that he failed to make two articular arguments.  First, he asserts that appellate counsel failed to argue that trial counsel was ineffective in not making a Confrontation Clause objection to Michael Peacock's testimony about Richard Peacock's statements.   (This claim is based on the same testimony that gives rise to Mr. Rogers' second claim, discussed in the preceding section.)  Second, he asserts that appellate counsel failed to argue on direct review that Mr. Masuda's failure to give notice of Mr. Rogers of his intent to withdraw denied him counsel and was federal structural error.

The California Supreme Court rejected Mr. Rogers' ineffective assistance of appellate counsel claims without discussion.

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland*.  *See Smith v. Robbins,* 528 U.S. 259, 285 (2000).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith*, 528 U.S. at 285; *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

1.   Failure to Argue Trial Counsel's Ineffectiveness

To determine whether appellate counsel's failure to raise a claim of ineffective assistance of trial counsel was objectively unreasonable and prejudicial, the district court must first assess the merits of the underlying claim that trial counsel provided constitutionally deficient performance.  *Moormann*, 628 F.3d at 1106-07.  If trial counsel's performance was not objectively unreasonable or did not prejudice the petitioner, then appellate counsel did not act unreasonably in failing to

United States District Court
For the Northern District of California

1    raise a meritless claim of ineffective assistance of counsel, and the petitioner was not prejudiced

2    by appellate counsel's omission. *Id.*

3           The California Supreme Court's rejection of Mr. Rogers' claim was not contrary to or an

4    unreasonable application of clearly established precedent from the U.S. Supreme Court.  As

5    explained in the preceding section, there was no Confrontation Clause objection that would have

6    succeeded regarding the admission of Michael Peacock's testimony as to the statements that

7    Richard Peacock had made.  Therefore, trial counsel was not ineffective in failing to object to the

8    testimony on Confrontation Clause grounds and appellate counsel was not ineffective in not

9    raising trial counsel's failure to object as a basis for reversal on appeal.  Mr. Rogers is not entitled

10   to relief on this claim.

                    2.      Failure To Argue Structural Error

11
12          On direct appeal, appellate counsel argued that Mr. Masuda failed to comply with

13   California Code of Civil Procedure sections 284 and 285, two statutes setting out the procedures

14   for withdrawal of counsel, and that these failures prejudiced Mr. Rogers.[5]  The California Court of

15   Appeal rejected that argument, stating that Mr. Rogers "does not adequately explain how

16   Masuda's request to be relieved, based on a conflict of interest, violated either of these

17   provisions." *Rogers*, 2012 WL 2053568, at *9.  Mr. Rogers now argues that appellate counsel was

18   ineffective in not arguing that Mr. Masuda's failure to give notice to Mr. Rogers of his intent to

19   withdraw denied him counsel and was federal structural error.

20          The California Supreme Court rejected the ineffective assistance of appellate counsel claim

21   without discussion.

22          There are two broad types of constitutional errors that may occur during the course of a

23

24   [5]  California Code of Civil Procedure section 284 provides:  "The attorney in an action or special
     proceeding may be changed at any time before or after judgment or final determination, as
25   follows: [¶] 1. Upon the consent of both client and attorney, filed with the clerk, or entered upon
     the minutes; [¶] 2. Upon the order of the court, upon the application of either client or attorney,
26   after notice from one to the other."

27          California Code of Civil Procedure section 285 provides: "When an attorney is changed, as
     provided in the last section, written notice of the change and of the substitution of a new attorney,
28   or of the appearance of the party in person, must be given to the adverse party. Until then he must
     recognize the former attorney."

United States District Court
For the Northern District of California

criminal prosecution: trial errors and structural errors.  A trial error is an error that is subject to a

harmlessness analysis.  A structural error is a "defect affecting the framework within which the

trial proceeds, rather than simply an error in the trial process itself."  *Arizona v. Fulminante*, 499

U.S. 279, 310 (1991).  Where a criminal proceeding is undermined by a structural error, the

"criminal trial cannot reliably serve its function as a vehicle for determination of guilt or

innocence," and the defendant's conviction must be reversed.  *Id.*  These cases are rare and require

automatic reversal.  *Washington v. Recuenco*, 548 U.S. 212, 218 (2006); *Brecht v. Abrahamson*,

507 U.S. 619, 629-30 (1993).

The list of Supreme Court cases in which structural error analysis has been found to apply

is short.  *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005).   They are*:  Sullivan v.

Louisiana*, 508 U.S. 275, 281 (1993) (defective instruction on the beyond-a-reasonable-doubt

standard); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) (unlawful exclusion of member of

defendant's race from grand jury); *Waller v. Georgia*, 467 U.S. 39, 49-50, 49 n.9 (1984) (denial of

right to public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984) (violation of right to

self-representation at trial); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (deprivation of

right to counsel); and *Tumey v. Ohio*, 273 U.S. 510, 531-32 (1927) (trial by biased judge).  *See

Campbell*, 408 F.3d at 1172.

In *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), the Supreme Court held that the

erroneous denial of counsel of choice also is structural error.  *Id.* at 146.  In *Gonzalez-Lopez*, the

parties did not dispute that the district court erroneously deprived the defendant of his choice of

counsel.  *Id.* at 144.  With that concession, there were two questions for the Supreme Court to

answer.  The first question was whether the defendant also had to show that replacement counsel

provided ineffective assistance at the trial or that the defendant was otherwise prejudiced for a

Sixth Amendment violation to have occurred.  *Id.* at 144.  The Supreme Court answered this

question in the negative.  "Where the right to be assisted by counsel of one's choice is wrongly

denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a

Sixth Amendment violation.  Deprivation of the right is 'complete' when the defendant is

erroneously prevented from being represented by the lawyer he wants, regardless of the quality of

United States District Court

For the Northern District of California

the representation he received." *Id.* at 148.  The second, similar-sounding but analytically distinct, question was whether the denial of the Sixth Amendment right to counsel of choice was structural error. *Id.* at 148-50.  The Supreme Court held that it was structural error. *Id.*

Mr. Rogers urges that his appellate counsel should have argued that Mr. Masuda's failure to provide notice of his withdrawal amounted to structural error, as established by *Gonzalez-Lopez*.  Such an argument would have had no likelihood of success.  First, the *Gonzalez-Lopez* case was about the denial of the Sixth Amendment right to choice of counsel and does not control the analysis of a claimed *state* law error -- i.e., the failure to comply with the procedures in California Code of Civil Procedure sections 284 and 285 for withdrawing from a case.  Since there is no federal constitutional violation stemming from the alleged state law error, there is no structural error.  Federal habeas relief is not available for such state law errors. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

Second, Mr. Rogers' argument presupposes that there was a denial of counsel of choice but it was incumbent on him to first show a denial of counsel of choice, because unless there is a denial of counsel, there is no constitutional error, and hence, the court has no occasion to consider whether any error was structural or trial error.  Here, there was no showing of a denial of counsel of choice; defense counsel wanted to withdraw and the court did not force counsel out.  The Sixth Amendment right to counsel of choice is not limitless, as explained in *Wheat v. United States*, 486 U.S. 153, 159 (1988). A defendant has no right to be represented by "an advocate who is not a member of the bar," "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant," and a defendant may not insist on being represented by "an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government." *Id.*  When he moved to withdraw, Mr. Masuda put himself in the category of an attorney "who for other reasons declines to represent the defendant." *Id.*  The right to choice of counsel did not give Mr. Rogers the right to force attorney Masuda (who believed that he had an ethical obligation to withdraw) to unwillingly remain in the case.  Arguing that denial of choice of counsel is structural error would not have been an effective appellate strategy unless and until the appellate attorney showed that there *was* a denial of choice

23

of counsel.  *See generally Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues").

Although the Supreme Court has determined that denial of choice of counsel is structural error (*Gonzalez-Lopez)* and that denial of counsel is structural error (*Gideon*), the Supreme Court has never established that a lawyer's failure to provide his client with notice of a motion to withdraw from representing the client in violation of state procedural rules amounts to a Sixth Amendment violation that is structural error.  The California Supreme Court's rejection of Mr. Rogers' claim that appellate counsel was ineffective in failing to argue that a lack of notice of Mr. Masuda's intent to withdraw amounted to federal structural error was not contrary to or an unreasonable application of clearly established law from the U.S. Supreme Court.  He is not entitled to the writ on this claim.

D.      No Certificate of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is **DENIED**.

## VI.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.


        **IT IS SO ORDERED**.


Dated: March 15, 2016

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California